IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DISTRICT

**ERICK WOODRUFF**                                                                                    **PLAINTIFF**

**VS.**                                          **CASE NO. 3:17-CV-00203-BSM**

**CITY OF JONESBORO, ARKANSAS, et al**                                **DEFENDANTS**

**DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS**

The Defendants, City of Jonesboro, Arkansas, Harold Perrin, Suzanne Allen, and Dewayne Douglas, individually and officially, by and through counsel, C. Burt Newell and Carolyn B. Witherspoon, and for their Statement of Undisputed Material Facts respectfully state as follows:

1. Plaintiff, Erick Woodruff, filed a Complaint on July 5, 2017, alleging that his rights were violated under state and federal law when he was terminated as the IT Director for the City of Jonesboro, Arkansas ("the City") on January 9, 2017. *(Doc.1*, *Plaintiff's July 5, 2017 Complaint)*.

2. The Complaint alleges that the moving force behind Plaintiff's termination was retaliation for the Plaintiff reporting the Mayor's son, Mark Perrin, to local and state authorities for misuse of his city-issued computer. *Id*.

3. The Plaintiff was initially hired as Director of Public Works for the City on April 11, 2006. *("Exhibit 1", Woodruff Deposition, p. 10, lines 17-19)*.

4. The interview committee that initially hired the Plaintiff consisted of three (3) caucasian individuals– Mayor Doug Forman, HR Director Suzanne Hackney, and Police Chief Mike Yates– and one African-American individual, Tony Thomas. *("Exhibit 1", pp. 11-12, lines 23-14)*.

4. When current Mayor Harold Perrin took office in 2009, he hired the Plaintiff as IT

Department Head when the position became available.  *("Exhibit 2", Perrin Deposition, p. 8, lines 7-11)*.

5.  The Plaintiff received a pay increase when he took over as the IT Department Head. *("Exhibit 2", p. 8, line 14 and "Exhibit 7", pp. 1-2).*

6.  On December 4, 2014, the Plaintiff arrived at work to find a help-desk request from Mayor Perrin's son, Mark, who worked part time entering sex-offender data at the Jonesboro Police Department ("JPD").  *("Exhibit 1", p. 28, line 2-4; p. 29, lines 9-22).*

7.  When the IT Department remotely viewed Mark's computer, they found that Mark was trying to change the firewall settings on his computer. *("Exhibit 1", p. 30, lines 4-23).*

9.  The Plaintiff called the City's Chief Financial Officer ("CFO") at the time, Ben Barylske and informed him that he needed to retrieve the computer. *("Exhibit 3", Barylske Deposition, p. 22, lines 6-12).*

10. Mr. Barylske and Mayor Perrin approved of the Plaintiff taking Mark's computer. *Id*.

11. So, the Plaintiff drove to the Criminal Investigation Division ("CID") of the Jonesboro Police Department, and took the CPU from the computer. *("Exhibit 1", p. 33, lines 10-17).*

12. The Plaintiff eventually spoke to Mayor Perrin about the incident, and the Mayor wanted to know, "what happened, why it happened, why would Mark want to– why was Mark doing that?" *("Exhibit 1", p. 44, lines 20-25).*

13. Mayor Perrin never fully discussed this incident with his son. Mark came to talk to him after his computer was pulled, and simply wanted to know why it happened, but Mark never shared his side of events. *("Exhibit 2", p. 45, lines 3-19, p. 46, lines 6-8).*

14. Mark's computer was ultimately sent to the Arkansas State Police, but their investigation never found anything of interest on Mark's computer. *("Exhibit 1", p. 41, lines 12-15 and "Exhibit 3", p. 25, lines 4-18).*

15. In December 2014, the Mayor, the Plaintiff, and Ben Barylske met with Cliff Rushing and Laurie Johnson from Edgewater Technology regarding the process of obtaining an audit of the IT Department. *("Exhibit 4", Rushing Deposition, pp. 9-10, lines 22-13).*

16. Mayor Perrin had been interested in obtaining an audit since 2009, because the City had grown significantly in that time but needed advice on how to request a proposal and how to obtain bids. *("Exhibit 2", p. 27, lines 5-18).*

17. It was important to Mayor Perrin to audit the Department, because "it's just good to have . . . another set of extra eyes looking at any department just like the audits we have over our finances every year." *("Exhibit 3", p. 38, lines 13-16).*

18. The Mayor began the process of contacting and setting up a meeting with Edgewater in early 2014. *("Exhibit 2", p. 28, lines 2-4).*

19. In fact, Mayor Perrin spoke with Cliff Rushing in 2009 or 2010 regarding an IT assessment while the Mayor was on the board of Delta Dental, because Cliff had been a consultant for Delta Dental since 2003. *("Exhibit 4", p. 7, lines 16-22).*

20. Mayor Perrin was primarily interested in whether IT employees had network and computer knowledge, if the network was safe and secure, and how well hardware and software were working. *("Exhibit 2", p. 30, lines 20-25).*

21. After meeting with Edgewater in late 2014, the Mayor and Ben Barylske determined that they would need to send out Requests for Proposals ("RFPs") in order to select a company to

conduct the audit. *("Exhibit 2", p. 29, lines 13-17).*

22.  These RFPs would have included "what we were looking for with a bunch of guidelines as to this is what was required to be able to do this job, and then those who had experience doing that would have submitted a bunch of maybe references or jobs that they had done similar to that and their qualifications for it and then a price as to how much it would cost to do that particular audit." *("Exhibit 3", p. 34, lines 2-9).*

23.  In the end, the City received five proposals, which were graded by the City Council finance committee. *("Exhibit 2", pp. 13-25).*

24.  After grading each proposal, the Finance Committee accepted Edgewater's bid by a narrow margin of only two or three points on or around April 15, 2015. *("Exhibit 2", p. 30, lines 8-18, p. 31, lines 16-20).*

25.  Edgewater began the assessment in May or June of 2015. Cliff Rushing was the principal auditor. *("Exhibit 4", p. 8, lines 7-8).*

26.  Cliff worked for Edgewater for 23 years, and acted as its Director of Technology for the majority of that time. *("Exhibit 4", p. 6, lines 13-19).*

27.  Edgewater conducts many audits around the country. *("Exhibit 4", p. 26, lines 18-3).*

28.  The audit included meeting with Department Heads and members of IT, looking over the IT set-up, and reviewing IT policies and procedures. *("Exhibit 4", p. 10, lines 6-14).*

29.  From the outset, the audit returned with negative results. "[T]he first day that they were out there . . . they pointed out that our network was not wired correctly, and it was wide open and the firewall being wide opened, and they fixed it right there on the spot." *("Exhibit 2", p. 39,*

*lines 15-21).*

30. Cliff soon learned that the IT Department needed training, and that its employees were "relatively inexperienced." *("Exhibit 4", p. 12, lines 20-21).*

31. Further, several departments complained about IT entering their computers remotely, opening documents, and reading emails. While this issue occasionally arises during audits, "[i]t is unusual for almost every department to have that come up." *("Exhibit 4", p. 14, lines 10-13).*

32. The audit later found that there were "no policies and procedures for the operation of the IT Department," only policies about computer usage that were more similar to HR policies than help-desk or computer back-up policies. *("Exhibit 4", p. 16, lines 9-25).*

33. These audit findings were presented to the City Council at their September 15, 2015 meeting. *("Exhibit 5", Affidavit of Suzanne Allen, ¶ 7).*

34. The City then contracted with Edgewater to ensure that the recommendations contained in the audit were implemented. *("Exhibit 5", ¶ 8).*

35. On September 21, 2015, the City hired Suzanne Allen as its CFO. *("Exhibit 5", ¶ 2).*

36. Ms. Allen was the former Director of Federal Programs and District Treasurer for the Hoxie School District, where she prepared the annual budget of ten to fifteen million dollars; submitted all required state reports; implemented the Arkansas School Improvement Planning process for the entire District; oversaw all federal employees on a building level; managed the staff within the Superintendent's office; oversaw the technology department budges and expenditures; oversaw all federal programs; prepared monthly bank reconciliation; prepared payroll for 155-180 employees; submitted monthly payroll reports to appropriate agencies; assisted the Superintendent with planning for the district, and received and managed over $2,000,000 in grant monies. *("Exhibit*

*5", ¶ 3).*

37. As CFO for the City of Jonesboro, Ms. Allen oversaw the Finance, Collections, Human Resources, and IT departments. *("Exhibit 5", ¶ 5).*

38. In this role, Ms. Allen worked with Cliff Rushing to draft an objective Performance Improvement Plan ("PIP") for the Plaintiff. The PIP "set specific goals and objectives with time frames to ensure that the audit recommendations were timely and properly implemented." *("Exhibit 5", ¶ 12; "Exhibit 6",COJ Docs., pp. 000045-000048).*

39. Cliff and Ms. Allen were interested in "including stuff from the [audit] recommendations . . . so that he would have specific tasks to perform." In fact, the Plaintiff was a part of the conversation around the audit findings. *("Exhibit 4", p. 18, lines 7-10, p. 19, lines 4-9).*

40. Everyone agreed that there were audit findings that needed to be "corrected or mitigated." *("Exhibit 1", p. 73, lines 14-16).*

41. Ms. Allen and HR Director Dewayne Douglas met with the Plaintiff on March 4, 2016 to review the PIP and their expectations. *(Exhibit "6", pp. 45-48).*

42. The PIP was entered into six months after Edgewater's findings were presented to the City Council. *("Exhibit 8", p. 51, lines 19-21).*

43. Mayor Perrin had no involvement in the drafting or execution of the PIP, but knew that it was an ongoing concern, and that issues that arose in the audit were not being completed and that they were working to correct audit findings. *("Exhibit 2", p. 32, lines 16-23, p. 34, lines 1-3, 18-22).*

44. Like Ms. Allen, Dewayne Douglas was hired after the Mark Perrin incident and the Edgewater audit, on January 26, 2016. *("Exhibit 7", Affidavit of Dewayne Douglas, ¶ 1).*

45. Mr. Douglas has a Master of Science in Human Resource management, and has a Professional Human Resource certification from the Society of Human Resource Management and the HR Certification Institute. *("Exhibit 7", ¶ 3).*

46. On March 21, 2016, Cliff and Ms. Allen met with the Plaintiff for his first PIP update. At that time, there were deficiencies in his documentation. *("Exhibit 5", ¶ 13).*

47. Next, on April 22, 2016, the Plaintiff sent Ms. Allen, Mr. Douglas, and Cliff documentation required by the PIP, and Cliff responded on May 2, 2016 with concerns about that documentation. That same day the Plaintiff met with Ms. Allen, Mr. Douglas and Cliff to address Cliff's concerns, and the Plaintiff was to follow-up later. *("Exhibit 5", ¶ 15).*

48. For example, the Plaintiff submitted a Business Continuity Plan to Cliff for approval without reviewing it first, he prepared and submitted incomplete documents, and failed to get back with Ms. Allen in a timely manner regarding Springbrook computer finance software. *("Exhibit 5", ¶ ¶ 16-18).*

49. Further, the Plaintiff was tasked to "put together information that would help support new positions . . . to show work that was unable to be performed . . . and then to create a list of employees and their roles and how they would fill the gap, and then to show what they looked like, and he came back with an administrative assistant for himself, three help desk people, and a raise for himself." *("Exhibit 4", p. 20, lines 7-20).*

50. The City purchased Airwatch software to manage security on mobile devices on December 10, 2015, and the Plaintiff was required to present to Department Heads on March 1, 2016 and the City Council on March 15, 2016. The software was to be deployed on April 4, 2016. Ms. Allen did not hear from the Plaintiff on this issue, and contacted him on June 29 and July 6, 2016

for an update, and the Plaintiff was not truthful about the reasons for the delay. It took a year for the partial deployment to be completed. *("Exhibit 5", ¶ 22).*

51.     In July 2016, Cliff submitted an updated status report highlighting items for which he had not received updates from the Plaintiff, and Ms. Allen was concerned about these performance issues. A meeting was set for a PIP follow-up on July 8, 2016 and was later extended on July 14, 2016, at which time Ms. Allen noted her concerns regarding incomplete documentation and expressed her future performance expectations. *("Exhibit 5", ¶ ¶ 23-26).*

52.     Cliff provided an additional PIP update on July 22, 2016, noting a number of items that had not been completed as required. *("Exhibit 5", ¶ ¶ 27-28).*

53.     The Plaintiff then asked for vacation time off and Ms. Allen responded by asking if he was comfortable with his progress on his PIP and received no response. *("Exhibit 5", ¶ 29).*

54.     On August 5, 2016, the Plaintiff sent documentation regarding items from his PIP, and when asked to provide them in a different format, the Plaintiff responded on August 12, 2016 with incomplete documents. *("Exhibit 5", ¶ ¶ 30-31).*

55.     Cliff advised Ms. Allen and Mr. Douglas on August 30, 2016 that many of the items that the Plaintiff claimed to be in progress were not, in fact, in progress at that time. Cliff was concerned that the Plaintiff had not done what he was asked to do, and that he consistently told "half-truths." *("Exhibit 5", ¶ ¶ 31-32).*

56.     By Plaintiff's own admission, he disagreed with Cliff on everything, at every step of the process. *("Exhibit 1", p. 25, lines 13-15).*

57.     The Plaintiff was given a Final Written Warning on September 13, 2016, because he was to have completed all activities from the PIP by September 5, 2016 and had failed to do so.

("Exhibit 5", ¶ 34; "Exhibit 6", pp. 000050-000051).

58.     The Plaintiff was notified at that time that he would not be eligible for a salary increase due to the final warning. ("Exhibit 5", ¶ 36; "Exhibit 6", pp. 000050-000051).

59.     Mayor Perrin had no notice of the Final Written Warning until after it was issued, when he was notified by Ms. Allen, nor did he have any role in denying the Plaintiff a raise. ("Exhibit 2", p. 15, lines 19-21, p. 16, lines 3-5).

60.     Ms. Allen denied the Plaintiff's pay raise in October 2016, due only to his Final Warning. Neither his race, nor his dealings with Mark Perrin had anything to do with her decision. ("Exhibit 5", ¶ 39).

61.     In fact, other minority employees under discipline received the October 2016 raise, including a Hispanic officer with the Jonesboro Police Department who received two written reprimands on March 25 and July 15, 2016 and a two day suspension on September 14, 2016. ("Exhibit 7", ¶¶ 23, 25).

62.     On September 8, 2016 an African American JPD Officer received a written reprimand, and received a salary increase in October 2016. ("Exhibit 7", ¶¶ 24-25).

63.     One African American sanitation department employee received a written warning for attendance issues, but received a $1,230.96 pay increase in October 2016. ("Exhibit 7", ¶ 26).

64.     An African American transit driver received a written warning for poor performance in July 2016 and received a $1,605.36 pay increase, and another African American transit driver received written counseling for violation of the Workplace Violence Guidelines and received a $5,544.48 raise, while another African American transit driver received a $6,078.72 pay increase after receiving written counseling for the same violation. ("Exhibit 7", ¶¶ 27-29).

65. On October 20, 2016, the Plaintiff notified Ms. Allen that he terminated service for a T-1 point to point circuit that was no longer needed, and Ms. Allen responded immediately, asking for more information. The Plaintiff did not respond until November 14, 2016 when Ms. Allen informed him that she would consider it insubordination if he did not responded. The Plaintiff responded that the City had been paying for the service unnecessarily for ten years. *("Exhibit 5", ¶ 40).*

66. Ultimately, Ms. Allen made the decision to terminate the Plaintiff, and did so on January 9, 2017 for failure to perform his work at an acceptable level, having never completed his PIP goals. *("Exhibit 5", ¶ 44; "Exhibit 6", p. 000053).*

67. The Plaintiff was not the only employee disciplined by Ms. Allen. *("Exhibit 5", ¶¶ 48-9).*

68. In fact, Ms. Allen counseled a white employee on February 10, 2016 who received a written warning on August 23, 2016. That employee resigned in lieu of termination on March 27, 2017. *("Exhibit 5", ¶ 48).*

69. Ms. Allen counseled another white employee on May 9, 2016 and May 19, 2017. This employee resigned in lieu of termination on September 18, 2017. *("Exhibit 5", ¶ 49).*

70. Further, the Plaintiff has no recollection of any other African American employee being terminated in his tenure with the City of Jonesboro. *("Exhibit 1" p. 150, lines 13-17).*

7. Mr. Douglas, in his position as Human Resources director, was able to find only one instance of the Plaintiff seeking additional personnel– a request for a part time secretary. *("Exhibit 7", ¶ 8).*

72. In fact, the IT Department is the same size it was at the time the Plaintiff was

terminated. *("Exhibit 7", ¶ 10).*

73.     Any comments by City employees of a racist or otherwise inappropriate nature were counseled by Mayor Perrin. *("Exhibit 2", p. 41, lines 15-23, "Exhibit 7", ¶ 30).*

74.     A 2015 Legislative Audit identified a number of IT issues in the City of Jonesboro. This was done at approximately the same time of the Edgewater audit. *("Exhibit 7", ¶ 14).*

75.     All City procedures were properly followed with respect to the Plaintiff's discipline and termination. *("Exhibit 6", p. 000084; "Exhibit 7", ¶ 16).*

76.     Mayor Perrin set a meeting with the Plaintiff for January 25, 2017, as Plaintiff had appealed to the Mayor from the termination decision made by Ms. Allen. After the meeting he reviewed the PIP, emails between Ms. Allen, Cliff, Mr. Douglas, and the Plaintiff, including progress reports, notes, and things that hadn't been done. *("Exhibit 2", p. 36, lines 21-25, p. 38, lines 9-15; "Exhibit 6", 000056).*

77.     The Mayor ultimately affirmed Ms. Allen's decision on January 27, 2017. *"Exhibit 6", p. 000057).*

78.     The Plaintiff ultimately appealed to the City Council on February 16, 2017, where he presented his facts and evidence. *("Exhibit 1", p. 105, lines 16-20, "Exhibit 9", Plaintiff's 2017 Appeal PowerPoint; "Exhibit 6", p. 000082.*

79.     Ms. Allen and Mayor Perrin's decisions were ultimately affirmed by the City Council on a vote of 11-1 in favor of upholding Plaintiff's termination. *("Exhibit 6", p. 000082).*

                                                    **Respectfully submitted,**

                                        **By:     /s/ C. Burt Newell**
                                                   **C. Burt Newell, Bar No. 82118**
                                                   **Attorney for Defendants**

P.O. Box 1620
Hot Springs, AR 71902-1620
(501) 321-2222
(501) 624-0533 Fax
aperma@hotspringslaw.net

**Carolyn B. Witherspoon, Bar No. 78172**
**CROSS, GUNTER, WITHERSPOON & GALCHUS, P.C.**
**500 President Clinton Avenue, Suite 200**
**Little Rock, AR 72201**
**501/371-9999**
**Fax: 501/371-0035**
cspoon@cgwg.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, and I hereby certify that I have mailed the document by the United States Postal Service to the following non-CME/ECF participants:

Lucien Gillham
SUTTER & GILLHAM, P.L.L.C.
P.O. Box 2012
Benton, AR 72018


By:   /s/ C. Burt Newell
       C. Burt Newell, Bar No. 82118