IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DISTRICT

ERICK WOODRUFF                                                    PLAINTIFF

VS.                          CASE NO. 3:17-CV-00203-BSM

CITY OF JONESBORO, ARKANSAS, et al                       DEFENDANTS

<u>PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS</u>

1. Plaintiff, Erick Woodruff, filed a Complaint on July 5, 2017, alleging that his rights were violated under state and federal law when he was terminated as the IT Director for the City of Jonesboro, Arkansas ("the City") on January 9, 2017. (Doc.1, Plaintiff's July 5, 2017 Complaint).

RESPONSE:  Admitted.  Ex. A, Woodruff Aff.

2. The Complaint alleges that the moving force behind Plaintiff's termination was retaliation for the Plaintiff reporting the Mayor's son, Mark Perrin, to local and state authorities for misuse of his city-issued computer. Id.

RESPONSE: Admitted in part, denied in part.  Admitted to the extent that Plaintiff was fired arising out of protected acts under the Whistleblower law, and his race. Denied to the extent contradictory to this. Ex. A, Woodruff Aff.

3. The Plaintiff was initially hired as Director of Public Works for the City on April 11, 2006. ("Exhibit 1", Woodruff Deposition, p. 10, lines 17-19).

RESPONSE:  Admitted. Ex. A, Woodruff Aff.

4. The interview committee that initially hired the Plaintiff consisted of three (3) caucasian individuals— Mayor Doug Forman, HR Director Suzanne Hackney, and Police Chief Mike Yates— and one African-American individual, Tony Thomas. ("Exhibit 1", pp. 11-12, lines 23-14).

RESPONSE: Admitted.   However, none of these people participated in the decision to fire Woodruff because none were with the City any more.   Ex. A, Woodruff Aff.

4. When current Mayor Harold Perrin took office in 2009, he hired the Plaintiff as IT Department Head when the position became available. ("Exhibit 2", Perrin Deposition, p. 8, lines 7-11).

RESPONSE: This is the second paragraph 4.   Admit that Perrin took office in 2009.  Admit that he became IT Department Head.  Plaintiff denies this was a hire.  He was already working there at the time as Director of Public Works, reporting directly to then Mayor Doug Forman.   Mayor Forman had wanted to give Woodruff a raise and brought the issue to the Finance Committee of the City Council.   At the time, the following departments reported directly to Woodruff: sanitation, streets, code enforcement, engineering, planning, and inspections. Perrin at the time was on the City Council, and on that Committee.  Forman was not running again, and Perrin was running for Mayor. Perrin said that he wanted to wait to address the issue of the Director of Public Works' pay until after the election. So the issue was tabled. When Perrin became Mayor, he made Woodruff IT Department Head.   He said he wanted to have all department heads report directly to him, which Plaintiff then did.   The effect of this was that Woodruff did not get the raise Mayor Forman wanted to give him, and his responsibilities were reduced. It was effectively a demotion. Ex. A, Woodruff Aff.

5. The Plaintiff received a pay increase when he took over as the IT Department Head. ("Exhibit 2", p. 8, line 14 and "Exhibit 7", pp. 1-2).

RESPONSE:  Denied.

6. On December 4, 2014, the Plaintiff arrived at work to find a help-desk request from Mayor Perrin's son, Mark, who worked part time entering sex-offender data at the Jonesboro Police Department ("JPD"). ("Exhibit 1", p. 28, line 2-4; p. 29, lines 9-22).

RESPONSE:  Admitted. Ex. A, Woodruff Aff. Mark Perrin was the Mayor's son, and he worked for the police department, doing sex offender registration. D.E. 25-5, Def. Ex. 3, 21-24. Mark was going to the police department after hours, which was not part of his job, and the police were concerned about it. D.E. 25-5, Def. Ex. 3, 27-28.  There had been problems with his computer, that had been created by Perrin trying to create back

door access to other systems in the police department, that he did not need to do his job.  So Massey began disabling these things, and locking down in the computer so that Perrin could not make such changes. Ex. C, Massey, 7-9.  Mark Perrin then wanted the computer opened back up. Ex. C, Massey, 9. Perrin was trying to share files across computers, which was improper.  Ex. C, Massey, 13.

7. When the IT Department remotely viewed Mark's computer, they found that Mark was trying to change the firewall settings on his computer. ("Exhibit 1", p. 30, lines 4-23).

RESPONSE: Admitted.   He also should have been terminated for doing so. There had been prior discussions with the Mayor about things missing from Mark's computer.  Doing what he did violated City of Jonesboro computer use policies.  It was in the police department, so breaching their firewall would have put confidential information in jeopardy. If there were files or emails containing the identity of confidential informants or undercover officers, they would be in jeopardy.   Social Security Numbers, dates of birth, financial information, medical information, or addresses of employees could get disclosed.  Ex. A, Woodruff Aff.

9. The Plaintiff called the City's Chief Financial Officer ("CFO") at the time, Ben Barylske and informed him that he needed to retrieve the computer. ("Exhibit 3", Barylske Deposition, p. 22, lines 6-12).

RESPONSE: Paragraph 8 skipped by Defendant. Denied. Page 31 of the deposition of plaintiff (Def. Ex. 1) indicates that Plaintiff tried to call people in CID and got Sgt. Cassie Brandon. She checked and found the computer unplugged, and plugged it back in  to the network.  Plaintiff called the Chief of Police, Barylske and Waterworth and could get none of them.   He drove and confiscated the computer.   The Mayor did not approve this because he did not speak to Woodruff or anyone who could have transmitted the request.   Later, Plaintiff spoke with Barylske, but permission was not given, because the seizure had occurred.  Plaintiff thinks Barylske got mixed up. Ex. A, Woodruff Aff.

10. Mr. Barylske and Mayor Perrin approved of the Plaintiff taking Mark's computer. Id.

RESPONSE: Denied for the reasons stated in Rsp. To Para. 8.

11. So, the Plaintiff drove to the Criminal Investigation Division ("CID") of the Jonesboro Police Department, and took the CPU from the computer. ("Exhibit 1", p. 33, lines 10- 17).

RESPONSE: Admit he drove there and took the computer.  Ex. A, Woodruff Aff.

12. The Plaintiff eventually spoke to Mayor Perrin about the incident, and the Mayor wanted to know, "what happened, why it happened, why would Mark want to—why was Mark doing that?" ("Exhibit 1", p. 44, lines 20-25).

RESPONSE:  Admitted.

13. Mayor Perrin never fully discussed this incident with his son. Mark came to talk to him after his computer was pulled, and simply wanted to know why it happened, but Mark never shared his side of events. ("Exhibit 2", p. 45, lines 3-19, p. 46, lines 6-8).

RESPONSE:  Denied.  Although Plaintiff was not a fly on the wall, but the Mayor is the Chief Executive of the city, and can require any employee, including his son, to tell him what was going on in a situation like this. If they refuse to do so, he can fire them. According to the Mayor, he did not, and he continued to let his son work at the city, with access to police information, having attempted to breach their firewalls.  At the same time, the Mayor is claiming that he began this audit because of a concern for security. That is inconsistent with letting his son continue to work and have access to these areas. Ex. A, Woodruff Aff.

14. Mark's computer was ultimately sent to the Arkansas State Police, but their investigation never found anything of interest on Mark's computer. ("Exhibit 1", p. 41, lines 12-15 and "Exhibit 3", p. 25, lines 4-18).

RESPONSE:         Denied.   Because there was a help request around December 4th, Woodruff attempted to browse across the network to Mark Perrin's machine, and could not find it.  He and Brandon Massey looked for it, and found it as

"CID spare".  They remoted into the computer and saw Mark trying to change the firewall proxy settings.    Then the computer went dead, which possibly means it was disconnected.  They tried to reestablish connection and could not make it. Woodruff then called everyone in CID and got Cassie Brandon, who found the computer unplugged from the network.  She plugged it in.  Mark was not there.  Woodruff attempted to contact the Chief, Barylske, and the Mayor and could not.   So he went and confiscated the computer.   After taking it, Woodruff talked to Detective Simpkins on the phone, and he told Woodruff that before Woodruff had been there, Mark had left, come back, plugged in a flash drive, and that the screen started blinking and flashing and doing weird things. After talking with Simpkins, Massey and Woodruff found that the computer had been wiped.  Which is not easy to do. It had been in working order up to the moment Mark unplugged it. It appears that Mark was ready to wipe the computer at a moment's notice, which indicates that he was hiding something.  This is also destruction of property, which violates Jonesboro policy.   The Chief denied to the Jonesboro Sun that the computer had been sent to the state police.  Either he never sent it, and did not tell Woodruff the truth about doing so, or he did not tell the truth to the newspaper. The Chief reports directly to the Mayor.  Either nothing was found by the state police because they never saw it, or because the computer was wiped by Mark, and they could not find anything. Ex. A, Woodruff Aff. Ex. C, Massey, 10-13, 16-17; Ex. B, Ratliff,  24-25.

15. In December 2014, the Mayor, the Plaintiff, and Ben Barylske met with Cliff Rushing and Laurie Johnson from Edgewater Technology regarding the process of obtaining an audit of the IT Department. ("Exhibit 4", Rushing Deposition, pp. 9-10, lines 22-13).

RESPONSE:  Denied to the extent Plaintiff was not at the meeting.   Admit the others were meeting with Edgewater in December 2014, well before the contract was awarded in Spring of 2015, giving the contractor inside information on what is wanted, and allowing them to construct the request for qualifications in such a way that the contractor is the best qualified.  The Mayor also wrote notes on the document to Rushing

and Edgewater that were critical of Woodruff, accusing him of spying, saying that city employees feared he was spying on them.   These critical comments were made right after the report on Mark Perrin. Ex. A, Woodruff Aff. Up to this point, Erick Woodruff was a great employee. D.E.25-5, Def. Ex. 3, Barylske, 6. He got an exceeds evaluation. D.E. 25-5, Def. Ex. 3, Barylske, 6-7. Woodruff had to balance security and the need for people to use their computers. D.E.25-5, Def. Ex. 3, Barylske, 12-13.   Woodruff was good about communicating with various departments, and the number of complaints decreased while he was IT Director.   D.E.25-5, Def. Ex. 3, Barylske, 12-13.   He was good about bringing problems to Barylske early to keep them from getting big.  D.E.25-5, Def. Ex. 3, Barylske, 14-15.   Woodruff was never disciplined. D.E.25-5, Def. Ex. 3, Barylske, 15. Woodruff would be audited by the FBI and ACIC. D.E.25-5, Def. Ex. 3, Barylske,  17.   Mayor's citation for distinguished service in December 2013. D.E.25-5, Def. Ex. 3, Barylske,  30; D.E. 25-4, Def. Ex. 2, Perrin, 11. No documentation of any performance problems. No discipline. D.E. 25-4, Def. Ex. 2, Perrin,  20, 25.

16. Mayor Perrin had been interested in obtaining an audit since 2009, because the City had grown significantly in that time but needed advice on how to request a proposal and how to obtain bids. ("Exhibit 2", p. 27, lines 5-18).

RESPONSE:   Denied.  It was 2014. If he wanted it done, he had 5 years to do it. He did not talk to the head of IT about it for years.  He did not take action on it until the same month as the problems with Mark Perrin.  If he was concerned about security why didn't the Mayor fire Mark Perrin for attacking the firewall. Why didn't the Mayor discipline Perrin. Why didn't the Mayor find out exactly what Mark Perrin did and let him continue to work.  Those actions violated city policy and may have been criminal.  Ex. A, Woodruff Aff.

17. It was important to Mayor Perrin to audit the Department, because "it's just good to have . . . another set of extra eyes looking at any department just like the audits we have over our finances every year." ("Exhibit 3", p. 38, lines 13-16).

RESPONSE:  Denied. If it was important, it would not have taken 5 years to get it done.   It only happened in December 2014, less than 3 weeks after Plaintiff reported Mark Perrin's conduct.   Furthermore, as stated above, letting Mark Perrin continue, without finding out what he did or why he did it, after attempting to hack the firewall, and after wiping the computer demonstrates the Mayor was not concerned about security. Ex. A, Woodruff Aff.

18. The Mayor began the process of contacting and setting up a meeting with Edgewater in early 2014. ("Exhibit 2", p. 28, lines 2-4).

RESPONSE:  Denied for the reasons stated in the response to paragraph 16 and 17.  Ex. Woodruff Aff. D.E. 25-5, Def. Ex. 3, Barylske, 20.

19. In fact, Mayor Perrin spoke with Cliff Rushing in 2009 or 2010 regarding an IT assessment while the Mayor was on the board of Delta Dental, because Cliff had been a consultant for Delta Dental since 2003. ("Exhibit 4", p. 7, lines 16-22).

RESPONSE: Denied for the reasons stated in the response to paragraph 16 and 17.  Ex. Woodruff Aff.

20. Mayor Perrin was primarily interested in whether IT employees had network and computer knowledge, if the network was safe and secure, and how well hardware and software were working. ("Exhibit 2", p. 30, lines 20-25).

RESPONSE: Denied for the reasons stated in the response to paragraph 16 and 17.  Ex. Woodruff Aff.

21. After meeting with Edgewater in late 2014, the Mayor and Ben Barylske determined that they would need to send out Requests for Proposals ("RFPs") in order to select a company to conduct the audit. ("Exhibit 2", p. 29, lines 13-17).

RESPONSE:   Admit they met with Edgewater in December 2014, shortly after Woodruff's reports of Mark Perrin's conduct. Admit that they are required to send out Requests for Proposal.   Edgewater had a competitive advantage on submitting a proposal, and was essentially pre-selected to win that bid, by virtue of the Mayor

meeting with them, asking them exactly what to ask for, and telling them exactly what he wanted. Ex. A, Woodruff.

22. These RFPs would have included "what we were looking for with a bunch of guidelines as to this is what was required to be able to do this job, and then those who had experience doing that would have submitted a bunch of maybe references or jobs that they had done similar to that and their qualifications for it and then a price as to how much it would cost to do that particular audit." ("Exhibit 3", p. 34, lines 2-9).

RESPONSE:   Admit this is a general outline of how RFP's work, but it is not complete.   The Mayor's desire was to get rid of Plaintiff, regardless of the RFP process. It is not normal to contact the company you know that you want to have the bid, have them draft the bid so that they will get it.  As stated above, they had gone 5 years, until the situation with Mark Perrin's computer without doing this.   The Mayor's actions with respect to Mark Perrin were inconsistent with a desire for security.   In working with Edgewater, and telling them what he wanted, the Mayor immediately made attacks on Woodruff.  Ex. A, Woodruff Aff.

23. In the end, the City received five proposals, which were graded by the City Council finance committee. ("Exhibit 2", pp. 13-25).

RESPONSE: Denied in part, admitted in part.  Admit that Edgewater's bid was accepted in 2015. Deny all else the attempt to act as though the Mayor had nothing to do with that choice and that it was the choice of the finance committee, for the reasons stated in the response to paragraphs 16, 17, and 21.   If the scoring was that close it seems likely the Mayor's prior contacts with Edgewater would give them an edge. Furthermore, the Mayor testified at pages 29-30 of his deposition that he was involved, along with his subordinates, Barylske,   L.M. Duncan (Operations director), and Mr. Geisler (Director of Communications), who all owed their jobs to the Mayor.  Also, Laurie Johnson of Edgewater, wrote an email in January 2, 2015, that stated exactly what it was that Edgewater was going to be doing, well before the grading or award or RFP.  It was at the Mayor's request and if you read, it is very clear, they are not suggesting what

kind of proposal the City should make, they confirming with the Mayor what they are going to do when they get that proposal. Also, it is strange to be grading an IT proposal when they don't ask the IT director for his input.   Woodruff had more knowledge about IT than any of the graders.   In addition, there is handwritten direction from the Mayor telling Edgewater exactly what he wants to do, which included personal, direct attacks on Woodruff.  Prior to this, Woodruff had gotten a good performance evaluation, had no discipline, and  got the Mayor's award which was the equivalent of employee of the year. Ex. A, Woodruff Aff. Furthermore, the Mayor testified that he and his subordinates, Barylske (CFO), LM Duncan (Operations Director), and Geisler (Director of Communications) made the decision. D.E. 25-4, Def. Ex. 2, Perrin, 29-30

24. After grading each proposal, the Finance Committee accepted Edgewater's bid by a narrow margin of only two or three points on or around April 15, 2015. ("Exhibit 2", p. 30, lines 8-18, p. 31, lines 16-20).

RESPONSE:  Admit that Edgewater won the bid, in a very close scoring, where the circumstances indicate they were handpicked and given every advantage so they would win the bid.   See Resp. Para. 23; Ex. A, Woodruff Aff. Deny the choice was anyone other than the Mayor's. See Rsp. SUF 23.

25. Edgewater began the assessment in May or June of 2015. Cliff Rushing was the principal auditor. ("Exhibit 4", p. 8, lines 7-8).

RESPONSE:  Admitted.

26. Cliff worked for Edgewater for 23 years, and acted as its Director of Technology for the majority of that time. ("Exhibit 4", p. 6, lines 13-19).

RESPONSE:  Admitted. Ex. A, Woodruff Aff.

27. Edgewater conducts many audits around the country. ("Exhibit 4", p. 26, lines 18-3).

RESPONSE:  Admitted. Ex. A, Woodruff Aff.

28. The audit included meeting with Department Heads and members of IT, looking over the IT set-up, and reviewing IT policies and procedures. ("Exhibit 4", p. 10, lines 6-14).

RESPONSE: Admit they did these things, and that Barylske who was CFO, stated the audit was unfair and unprofessional, which is significant given that Barylske was with the Division of Legislative Audit for around 10 years.    See his deposition testimony at pages 41-43.  Admit the Mayor told Edgewater what he wanted very clearly when he directed them to look at Woodruff using personal attacks on him.    Ex. A, Woodruff Aff.

29. From the outset, the audit returned with negative results. "[T]he first day that they were out there . . . they pointed out that our network was not wired correctly, and it was wide open and the firewall being wide opened, and they fixed it right there on the spot." ("Exhibit 2", p. 39, lines 15-21).

RESPONSE: Denied.  First, how would he know this – he didn't do it.  Second, the whole statement is ridiculous for a number of reasons:

1. To access the network, and the computers in the network, you must have a user id and password established by my department. The auditors never got either. They had to look over the shoulder of the techs and Woodruff to review the network.  They could not have made any changes.

2. The firewall worked pretty well when it caught and stopped Mark Perrin's attempts to put things on the computer he should not.

3. Firewalls have logs which describe the number of attacks made on them daily. Attempted attacks happened on a daily basis through the internet.  If the network was "wide open" due to the firewall, there would have been numerous successful attacks.

4. The comments about it not being "wired correctly" is out of nowhere.   The computers are wired into the network by ethernet cables. They do not access the internet directly, but go through a proxy server.   The proxy server is what

connects to the internet.  It is controlled by the IT department, and is where the information about what various users (city employees) can do.  So for instance, if they type in the name of a pornography site, they will not be allowed to go to it. Wiring would not have been a problem with the firewall.  The kinds of problems you would have with a firewall is that it is not updated to catch new kinds of threats. This was a new firewall, and it was up to date.

Ex. A, Woodruff Aff. Running a large network is an ongoing process, and there are always ways to improve it.  Ex. B, Ratliff, 15-16.  The audit identified things that could be improved, but did not mean they were doing a bad job.  Ex. B, Ratliff, 16-17.  Despite their claims that Woodruff was not doing his job, this is belied by his replacement, Mr. Ratliff. Ratliff replaced Woodruff as the IT Director, and before that he was a network technician as well.  Ex. B, Ratliff, 5. When he was a tech, Woodruff was his boss. He found Woodruff to be a good boss and knowledgeable.  6. Woodruff was timely about responding to problems.  Ex. B, Ratliff, 6. Ratliff has had communications with Woodruff since Woodruff was fired to get help on handling particular issues with the IT Department.  Woodruff was always happy to help.  Ex. B, Ratliff, 25. Woodruff did a good job as IT Director. Ex. B, Ratliff,  48.

30.  Cliff soon learned that the IT Department needed training, and that its employees were "relatively inexperienced." ("Exhibit 4", p. 12, lines 20-21).

RESPONSE:  Admitted in part, denied in part.  First, IT is a constantly changing discipline.   It's fair to say that people working in this discipline would always be benefitted by more training.  Second, the Network Administrator had been there for more than 10 years.  He had received training and certifications. The network tech had been there 8-9 years and had received training and certifications. Third, the city does not pay what private industry does.  This makes it difficult to retain and recruit IT people.  Fourth, we were understaffed and underfunded, which Rushing also found to be the case. When Woodruff submitted plans for training and additional staff, to reduce the workload,

it was denied.  This increases workload, which affects the time they had to train, and what training they can pay to do.

31. Further, several departments complained about IT entering their computers remotely, opening documents, and reading emails. While this issue occasionally arises during audits, "[i]t is unusual for almost every department to have that come up." ("Exhibit 4", p. 14, lines 10-13).

RESPONSE: Denied.   First, there is a difference between browsing into a computer and remoting into a computer.  If you browse to a computer, you get on the root of the computer itself, and look at things on the actual computer.  The user would have no way of ever knowing that you had done it.  Even if they were on the computer, at the same time, using it, there is simply no way they would notice. Remoting into a computer is different.  You can request permission to enter that computer, or do a forced remote.  If the user is not there, you can take it over.  Then they could tell someone was remoted into the computer because the mouse pointer would actually move, and they could see windows being opened.  It was easier and simpler to browse into the computer for Woodruff and the people under him. They would have no reason to remote into the computer.   Second, if IT wanted to look at emails, they coudl access them directly through the mail server, without having to go to an employee's computer.  It would be easier to go through the mail server.  Third, if these things were happening, there should be logs on the server and computers to establish this.   Surely an auditor such as Rushing could do that.  Fourth, they were way to busy to be poring over emails.  It would be boring and a waste of time.  Fifth, the Mayor told Edgewater what to find on this point in his handwritten notes.   Who else did he give instruction to on this issue – what employees?  Sixth, this is Rushing's account of what he was told by other people.   It would be interesting to hear what they actually were asked and what they actually said. Seventh, this is part of what Barylske identified as being unfair and unprofessional in his deposition at pages 41-43. Ex. A, Woodruff Aff.

32. The audit later found that there were "no policies and procedures for the operation of the IT Department," only policies about computer usage that were more similar to HR policies than help-desk or computer back-up policies. ("Exhibit 4", p. 16, lines 9-25).

RESPONSE: Denied. They had policies and procedures for the help-desk, maintaining the network, backing up the network, and securing the network. Ex. A, Woodruff Aff.

33. These audit findings were presented to the City Council at their September 15, 2015 meeting. ("Exhibit 5", Affidavit of Suzanne Allen, IJ 7).

RESPONSE: Admit the biased, predetermined, retaliatory and discriminatory findings were submitted to City Council on 9/15/15.  Ex. A, Woodruff Aff.

34. The City then contracted with Edgewater to ensure that the recommendations contained in the audit were implemented. ("Exhibit 5",118).

RESPONSE:  Admit they were paid $50,000 to come in to audit the police for two days, and of course, found something. Ex. A, Woodruff Aff.

35. On September 21, 2015, the City hired Suzanne Allen as its CFO. ("Exhibit 5", ¶ 2).

RESPONSE: Admitted.

36. Ms. Allen was the former Director of Federal Programs and District Treasurer for the Hoxie School District, where she prepared the annual budget of ten to fifteen million dollars; submitted all required state reports; implemented the Arkansas School Improvement Planning process for the entire District; oversaw all federal employees on a building level; managed the staff within the Superintendent's office; oversaw the technology department budges and expenditures; oversaw all federal programs; prepared monthly bank reconciliation; prepared payroll for 155-180 employees; submitted monthly payroll reports to appropriate agencies; assisted the Superintendent with planning for the district, and received and managed over $2,000,000 in grant monies. ("Exhibit 5", ¶ 3).

RESPONSE:  Objection – not a material fact.  This is the sort of thing that is an attempt to bolster her credibility, which may not judged. If she makes a fact statement that is disputed, that statement must be disbelieved at this stage.

37. As CFO for the City of Jonesboro, Ms. Allen oversaw the Finance, Collections, Human Resources, and IT departments. ("Exhibit 5", 115).

RESPONSE:  Admitted.

38. In this role, Ms. Allen worked with Cliff Rushing to draft an objective Performance Improvement Plan ("PIP") for the Plaintiff. The PIP "set specific goals and objectives with time frames to ensure that the audit recommendations were timely and properly implemented." ("Exhibit 5",1112; "Exhibit 6",C0J Does., pp. 000045-000048).

RESPONSE: Admitted in part, denied in part.  Admit Allen worked with Rushing to draft a PIP for Woodruff.  Deny it was objective.  Deny they were trying to ensure that audit recommendations were timely and properly implemented.  First, they said IT was short-staffed and needed training. When Woodruff presented a budget with additional staff and training. This was denied.  It seems unfair to find that his staff is undertrained, and there are not enough of them, and then complain about the amount of work they are getting done.   Second, they are claiming IT did not have policies, as described in paragraph 32.  That was not true.   Third, they complained about Airwatch not being fully implemented, but that has never been fully implemented to this day.   Furthermore, part of why it did not get implemented is that the Airwatch App was removed from the Appstore due to problems. That is not Woodruff's fault. Fourth, they complained about certain programs not having been updated.   One of those was a program written by an individual, to which there are no updates, and it just needed to be scrapped.   The other was a program that had updates available, but they were not necessary, provided no service that was needed, and cost money, so after discussion with CFO Barylske, they decided not to update it.   Fifth, Woodruff's replacement, a Caucasian who did not engage in whistleblowing, thinks Woodruff was a good boss, and still calls him with questions about how to do the job, which Woodruff responds to, to give the city help.

Sixth, the PIP was based on the findings of Edgewater, which arose out of an investigation aimed at Woodruff, that was described as unprofessional and unfair. Seventh, during the period of this PIP, they had an entire 911 Center to rewire, which they did successfully, without it ever going down.  Previously, that sort of work had gotten Woodruff the Mayor's Certificate. Eighth, the PIP was a lot of busy work, that added to Woodruff's workload, without actually causing much to be accomplished. According to them IT was understaffed and undertrained (which they refused to fix), he had a major project in the 911 Center, and I had the additional PIP busywork.  All they did was make Woodruff's job harder with additional detailed explanations in regards to all responses made to Suzanne Allen, CFO. Example – Woodruff was required to look up detailed purchases as well as renewals on every request by Suzanne Allen. These requests sometimes took days to gather the information required to make a response to Suzanne Allen.

39. Cliff and Ms. Allen were interested in "including stuff from the [audit] recommendations . . . so that he would have specific tasks to perform." In fact, the Plaintiff was a part of the conversation around the audit findings. ("Exhibit 4", p. 18, lines 7-10, p. 19, lines 4-9).

RESPONSE:  Denied as to Allen's and Rushing's interests for the reasons stated in the response to para. 38.   As to second sentence, deny.   Rushing, Perrin, Allen, Witherspoon, and Douglas, all drafted the PIP together.      Ex. A, Woodruff Aff.

40. Everyone agreed that there were audit findings that needed to be "corrected or mitigated." ("Exhibit 1", p. 73, lines 14-16).

RESPONSE: Admitted in part, denied in part.  Admit that the audit found things. But if you go to an IT Department as an auditor, you're always going to find something. Deny all findings were accurate – for example the supposed lack of policies discussed above.   Deny they were actually interested in fixing the problems. They said IT did not have enough staff and they needed training, and IT under Woodruff got neither.   Then

they try to blame Woodruff for not getting things done, when they have also added to his workload.  See the issues described in response to para. 38 above.  Ex. A, Woodruff Aff.

41. Ms. Allen and HR Director Dewayne Douglas met with the Plaintiff on March 4, 2016 to review the PIP and their expectations. (Exhibit "6", pp. 45-48).

RESPONSE:  Admitted.

42. The PIP was entered into six months after Edgewater's findings were presented to the City Council. ("Exhibit 8", p. 51, lines 19-21).

RESPONSE:  Admitted.

43. Mayor Perrin had no involvement in the drafting or execution of the PIP, but knew that it was an ongoing concern, and that issues that arose in the audit were not being completed and that they were working to correct audit findings. ("Exhibit 2", p. 32, lines 16-23, p. 34, lines 1-3, 1822).

RESPONSE:  Denied.  As stated above, the Mayor instituted this right after the report on Perrin, told Edgewater what he wanted to find, made sure Edgewater got the job, made sure they knew to target me through their notes, they carried out an investigation that was unfair and unprofessional according to Barylske, under resourced me to hamper me carrying out the changes Edgewater wanted, Edgewater's findings were partially false (spying, no policies and procedures, not updating a one-off program or doing unneeded and costly updates), blamed me for things not within my control (Airwatch), and people like Allen and Douglas report to the Mayor. The circumstantial evidence shows every part of this was unfair and targeted at me, and I believe that he continued to make his desires known to Rushing,  Allen, and Douglas.

44. Like Ms. Allen, Dewayne Douglas was hired after the Mark Perrin incident and the Edgewater audit, on January 26, 2016. ("Exhibit 7", Affidavit of Dewayne Douglas, ¶ 1).

RESPONSE:  Admitted.

45. Mr. Douglas has a Master of Science in Human Resource management, and has a Professional Human Resource certification from the Society of Human Resource Management and the HR Certification Institute. ("Exhibit 7", ¶ 3).

RESPONSE:  Admitted.

46. On March 21, 2016, Cliff and Ms. Allen met with the Plaintiff for his first PIP update. At that time, there were deficiencies in his documentation. ("Exhibit 5",1113).

RESPONSE:  Denied. The notes state that they wanted to change the support policy because it stated maximum response times, but did not say response could be earlier.  Of course a response can be earlier.  Nothing says it cannot.  Changing that language is meaningless. As to the budget, the budget Woodruff put together is the normal format for a budget put together in Jonesboro.   Ex. A, Woodruff Aff.

47. Next, on April 22, 2016, the Plaintiff sent Ms. Allen, Mr. Douglas, and Cliff documentation required by the PIP, and Cliff responded on May 2, 2016 with concerns about that documentation. That same day the Plaintiff met with Ms. Allen, Mr. Douglas and Cliff to address Cliff's concerns, and the Plaintiff was to follow-up later. ("Exhibit 5",P. 15).

RESPONSE:  Denied. As to COJ 168-169 (D.E. 25-9, p. 70-71), the email chain reflects that they asked about whether or not requirements were provided to the vendor for a business continuity document on May 4.  That was done before I was IT Director, and so would have been more than 7 years old.  I had asked purchasing for it (if it still existed), but the employee was out and could not respond yet. I told them this by May 6. COJ 279 shows the infrastructure team had the plan by May 2 to review.  As to the project budget, they told me I had to have a reason, and I gave them one – increasing bandwidth.  Then they said that was not enough, I needed to say why more bandwidth was desired.  This is the sort of thing that is capable of infinite reduction, if you are looking to create a problem where none exists.   Side by side changes for Microsoft Office 2007 vs. 2016 was the guide from the Microsoft Migration team recommendation.

48. For example, the Plaintiff submitted a Business Continuity Plan to Cliff for approval without reviewing it first, he prepared and submitted incomplete documents, and failed to get back with Ms. Allen in a timely manner regarding Springbrook computer finance software. ("Exhibit 5", 'pp.16-18)

RESPONSE: Denied.  He was not submitting anything for approval – they asked to see the Business Continuity Plan, one already existed, and he sent it to them.  As to Springbrook, he responded to her email in less than an hour.  Furthermore, there was a response given. Allen then asked for full descriptions of versions, options, migration of legacy software.  These responses were researched with two vendors which required more than one or two days to compile accurate, detailed information as requested by Allen.  All this was taking place while trying to work PIP, FOIA items, and other City of Jonesboro projects that are listed in the project weekly update report as well.  All while understaffed and undertrained.

49. Further, the Plaintiff was tasked to "put together information that would help support new positions . . . to show work that was unable to be performed . . . and then to create a list of employees and their roles and how they would fill the gap, and then to show what they looked like, and he came back with an administrative assistant for himself, three help desk people, and a raise for himself." ("Exhibit 4", p. 20, lines 7-20).

RESPONSE: Deny that Plaintiff failed to do this.  The audit stated that they were understaffed and that the user to IT ratio was way too high.  Woodruff created a budget using standard City of Jonesboro budgets.  Cliff told Woodruff it was good.  Now they claim it is bad.   Furthermore, their job titles explain what they would be doing: "administrative assistant" and "help desk people".   In addition, Woodruff was told to create a budget, which he did. He created the same budget, and budget request as all other COJ department heads.  The request for budget was submitted November 3, 2015 to Suzanne Allen with the incorporation of Edgewater's "Next Steps" to mitigate their audit finds.   The budget created did show salary increases for current staff which is common practice within COJ departmentalized budgets.  It is also common practice that

any job descriptions, especially newly created positions, come from the Director of Human Resources.  All job descriptions with appropriate pay scales comes directly from HR.  Ex. A, Woodruff Aff.

50. The City purchased Airwatch software to manage security on mobile devices on December 10, 2015, and the Plaintiff was required to present to Department Heads on March 1, 2016 and the City Council on March 15, 2016. The software was to be deployed on April 4, 2016. Ms. Allen did not hear from the Plaintiff on this issue, and contacted him on June 29 and July 6, 2016 for an update, and the Plaintiff was not truthful about the reasons for the delay. It took a year for the partial deployment to be completed. ("Exhibit 5",P.22).

RESPONSE: Denied.   First, Airwatch deployment has never yet been completed, and if they say it has, they are lying.  Second, he was not untruthful. Third, part of the reason for the Airwatch delay was that their app was taken out of the Appstore. Fourth, part of the reason things did not get done quicker is that IT was understaffed, and according to them, undertrained, and requests for more staff and training were not approved.   Fifth, they were also rewiring an entire 911 Center in that same year, which occurred without the Center ever going down.   Sixth, on May 9, he requested that a new FTP server be purchased to deploy Airwatch, which was not approved until May 25, and that on June 7 the Airwatch App was removed from the Appstore, that on June 17 the servers actually arrived in Jonesboro, that on June 23 Airwatch went back on the Appstore and they would resume testing. Also, the Airwatch deployment project was assigned to current Director of Information Systems, Jason Ratliff.   This timeline was not something he made up in a vacuum.   It was discussed with her. She knew what was going on. (He sent her email dated July 6, 2016, 3:41 P.M – Subject: Airwatch: TO: Suzanne Allen, which described this).  Also,  on March 7 all projects were put on hold by Suzanne Allen after issuing the bogus PIP.  Ex. A, Woodruff Aff.

51. In July 2016, Cliff submitted an updated status report highlighting items for which he had not received updates from the Plaintiff, and Ms. Allen was concerned about these performance issues. A meeting was set for a PIP follow-up on July 8, 2016 and was later extended on July 14, 2016, at which time Ms. Allen noted her concerns regarding incomplete documentation and expressed her future performance expectations. ("Exhibit 5",pp. 23-26).

RESPONSE:  Admit this went to Allen.  However, As it relates to the bogus PIP, emails between Rushing, Allen, and Douglas, COJ 000198 shows clearly Rushing provided written detailed examples, explanations, and recommendations to them, but was vague with Woodruff, who is the one who could have used such information. Rushing Never provided this type of detailed emails to Woodruff and he was excluded from covert emails regarding my PIP progress.  Ex. A, Woodruff Aff.

52. Cliff provided an additional PIP update on July 22, 2016, noting a number of items that had not been completed as required. ("Exhibit 5", ¶ ¶ 27-28).

RESPONSE:  Ex. A, Woodruff Aff.: "See email dated August 5, 2016 sent 3:07 P.M. to Cliff Rushing and copied to Suzanne Allen and Dewayne Douglas. The subject is: ITEMS. Three attachments for Networks Security policy, VLAN SOW, and IT operations and maintenance Plan were provided at this time.  Also, see email August 5, 2016, sent at 4:00 P.M. to Suzanne Allen, copied to Dewayne Douglas – the subject is ITEMS.  The email body explains why I had not submitted the items requested due to a FOIA that required me working on Saturday as well as Sunday to fulfill the FOIA request relating to Wixson Huffstetler's racial tweet. Provided Suzanne Allen with updates as to timeline for FOIA completion and the extreme number of emails that had to be vetted, redacted between COJ attorneys and myself.   See email dated July 27, 2016 to Cliff Rushing, copied to Suzanne Allen and Dewayne Douglas at 5:09 P.M  and 6:08 P.M - subject is ITEMS – COJ 000175 explaining there were 1100 emails regarding the FOIA request." Ex. A, Woodruff.

53. The Plaintiff then asked for vacation time off and Ms. Allen responded by asking if he was comfortable with his progress on his PIP and received no response. ("Exhibit 5",1129).

RESPONSE:  Admit that he did not respond to an email at 10:00 p.m.   Ex A, Woodruff.

54. On August 5, 2016, the Plaintiff sent documentation regarding items from his PIP, and when asked to provide them in a different format, the Plaintiff responded on August 12, 2016 with incomplete documents. ("Exhibit 5 ",111130-31).

RESPONSE: Denied.   August 5, 2016,   Woodruff submitted network security policy, VLAN SOW and O&M plans.  They were in PDF format.  After Rushing requested the documents on August 12, 2016, be in Office format with track changes on, they were then submitted back to Rushing on August 12 in Office format WITH track changes. August 12 was the FIRST time Rushing had requested Office format with track changes. Attachments included: IT Operations & Maintenance Plan, Networks Security Policy, Staffing Plan, and VLAN SOW.  Also, COJ Disaster Recovery Plan RFQ (Request for Qualifications),  Throughput Test Results (from Ritter), COJIS Technical Support Document were submitted in PDF format.  The COJIS Technical Support document was a completely new document which had been totally revised, therefore all changes that had been made prior to Rushing's request were already edited.  COJ Requirements for Disaster Recovery and Throughput Test Results were not part of my work product. These items were from a vendor (Ritter) and COJ Purchasing Agent for the RFQ.  These items were not a part of the bogus PIP requirements.  There were two new documents submitted in Excel format – Meeting agenda and Project Roadmap.  Ex. A, Woodruff.

55. Cliff advised Ms. Allen and Mr. Douglas on August 30, 2016 that many of the items that the Plaintiff claimed to be in progress were not, in fact, in progress at that time. Cliff was concerned that the Plaintiff had not done what he was asked to do, and that he consistently told "half-truths." ("Exhibit 5", 111131-32).

RESPONSE:  Denied. Ex. A, Woodruff aff.  He did not tell half truths.  He did not say things were in progress that were not.  He did what he was asked to do, but Rushing would create a secret paper trail by complaining of Woodruff not meeting requirements, that Rushing had never communicated to Woodruff.

56. By Plaintiff's own admission, he disagreed with Cliff on everything, at every step of the process. ("Exhibit 1", p. 25, lines 13-15).

RESPONSE: Denied – if you look at that testimony, it does not even talk about Cliff. Ex. A, Woodruff.

57. The Plaintiff was given a Final Written Warning on September 13, 2016, because he was to have completed all activities from the PIP by September 5, 2016 and had failed to do so.  ("Exhibit 5", ¶ 34; "Exhibit 6", pp. 000050-000051).

RESPONSE:  Admit he got a final written warning, deny it was valid.   It was retaliatory and discriminatory.  Ex. A, Woodruff.

58. The Plaintiff was notified at that time that he would not be eligible for a salary increase due to the final warning. ("Exhibit 5", ¶ 36; "Exhibit 6", pp. 000050-000051).

RESPONSE:  Admit he was denied a salary increase, deny it was due to the final warning. It was related to race and retaliation for the reasons stated in the response to para. 1-57. Ex. A, Woodruff.

59. Mayor Perrin had no notice of the Final Written Warning until after it was issued, when he was notified by Ms. Allen, nor did he have any role in denying the Plaintiff a raise. ("Exhibit 2", p. 15, lines 19-21, p. 16, lines 3-5).

RESPONSE:  Denied for the reasons stated in the response to para. 43.   In addition, no one else was denied a raise, even though some of them had discipline in their file, for example, Wixson Huffstetler, Director of Parks & Recreation, and also a Caucasian male.   He was white and engaged in no whistleblowing activities. Ex. A, Woodruff.

60. Ms. Allen denied the Plaintiff's pay raise in October 2016, due only to his Final Warning. Neither his race, nor his dealings with Mark Perrin had anything to do with her decision. ("Exhibit 5",¶39).

RESPONSE:  Denied. See the Resp. to Para. 59.

61. In fact, other minority employees under discipline received the October 2016 raise, including a Hispanic officer with the Jonesboro Police Department who received two written reprimands on March 25 and July 15, 2016 and a two day suspension on September 14, 2016. ("Exhibit 7",¶¶ 23, 25).

RESPONSE:  Admitted.

62. On September 8, 2016 an African American JPD Officer received a written reprimand, and received a salary increase in October 2016. ("Exhibit 7", ¶ ¶ 24-25).

RESPONSE:  Admitted.

63. One African American sanitation department employee received a written warning for attendance issues, but received a $1,230.96 pay increase in October 2016. ("Exhibit 7", ¶ 26).

RESPONSE:  Admitted.

64. An African American transit driver received a written warning for poor performance in July 2016 and received a $1,605.36 pay increase, and another African American transit driver received written counseling for violation of the Workplace Violence Guidelines and received a $5,544.48 raise, while another African American transit driver received a $6,078.72 pay increase after receiving written counseling for the same violation. ("Exhibit 7",¶¶27-29).

RESPONSE:  Admitted.

65. On October 20, 2016, the Plaintiff notified Ms. Allen that he terminated service for a T-1 point to point circuit that was no longer needed, and Ms. Allen responded immediately, asking for more information. The Plaintiff did not respond until November 14, 2016 when Ms. Allen informed him that she would consider it

insubordination if he did not responded. The Plaintiff responded that the City had been paying for the service unnecessarily for ten years. ("Exhibit 5", 11 40).

RESPONSE: Admitted in part, denied in part, based on the following: "On October 20, 2016, I terminated the T-1 circuit that saved the City of Jonesboro $2,821 per month and $33,852 annually and stated the reason why to Suzanne Allen, Mayor Perrin, Jeff Presley (E911 Director), Teresa Shaver, (Accounts Payable) and Ed Tanner (Chief Operations Officer).  This circuit was not in use and was not my responsibility.  It had been budgeted in the E911 departmental budget since 2008.  On September 30, 2016, I added the AT&T circuit (line item 18) on my WEEKLY project task list email to Suzanne Allen.  On October 20 I sent the formal email detailing the termination of the AT&T T-1 line in question. There were 6 (six) updates provided that included this information to Suzanne Allen on a weekly basis. We discussed in person multiple times how I would provide updates on projects I was working on.   All this information was provided to Allen on November 14 as well as dates prior to November 14.   See email from Woodruff to Allen on November 14, 2016 – 4:32 P.M. with attached project task list – RE: AT& T Land Line Charges."  Ex. A, Woodruff.

66. Ultimately, Ms. Allen made the decision to terminate the Plaintiff, and did so on January 9, 2017 for failure to perform his work at an acceptable level, having never completed his PIP goals. ("Exhibit 5", ¶ 44; "Exhibit 6", p. 000053).

RESPONSE:  Denied for the reasons stated in para. 1-65.

67. The Plaintiff was not the only employee disciplined by Ms. Allen. ("Exhibit 5", ¶ ¶ 48-9).

RESPONSE:  Objection – not a material, undisputed fact. Furthermore, it is, at best, circumstantial evidence without an adequate foundation to cause it to justify an inference for them and against plaintiff to establish similarity. Furthermore, at this stage of the case, even with such a foundation as circumstantial evidence, no inference in defendant's favor can be drawn, as this is summary judgment.

68. In fact, Ms. Allen counseled a white employee on February 10, 2016 who received a written warning on August 23, 2016. That employee resigned in lieu of termination on March 27, 2017. ("Exhibit 5",1148).

RESPONSE:  See objection to para. 67.

69. Ms. Allen counseled another white employee on May 9, 2016 and May 19, 2017. This employee resigned in lieu of termination on September 18, 2017. ("Exhibit 5", ¶ 49).

RESPONSE:  See objection to para. 67.

70. Further, the Plaintiff has no recollection of any other African American employee being terminated in his tenure with the City of Jonesboro. ("Exhibit 1" p. 150, lines 13-17).

RESPONSE:  Admit he does not keep a running list of what they do to African-Americans.

71. Mr. Douglas, in his position as Human Resources director, was able to find only one instance of the Plaintiff seeking additional personnel— a request for a part time secretary. ("Exhibit 7", 118).

RESPONSE: Denied.   Even Defendant admitted that Plaintiff requested an administrative assistant and 3 additional help desk employees.  Ex. A, Woodruff Aff.; See para. 49 above.

72. In fact, the IT Department is the same size it was at the time the Plaintiff was terminated. ("Exhibit 7", Ill 10).

RESPONSE: Admitted – and they recommended that IT get additional employees because they were severely understaffed, and said IT needed training, and they denied additional staff and training, and then complained about the amount of work Woodruff could complete.

73. Any comments by City employees of a racist or otherwise inappropriate nature were counseled by Mayor Perrin. ("Exhibit 2", p. 41, lines 15-23, "Exhibit 7", 30).

RESPONSE:  Denied.

74. A 2015 Legislative Audit identified a number of IT issues in the City of Jonesboro. This was done at approximately the same time of the Edgewater audit. ("Exhibit 7", ¶ 14).

RESPONSE:  Admit some issues were found, but as stated elsewhere, an audit will always find some issues, but that does not mean they were doing a bad job. Ex. B, Ratliff, 15-17. It does not change the fact that the man they chose as Woodruff's successor indicated that Woodruff was a good IT Director and had fixed most of the issues identified by the audit, and still goes to him for help.  Ex. B, Ratliff, 5-6, 48

75. All City procedures were properly followed with respect to the Plaintiff's discipline and termination. ("Exhibit 6", p. 000084; "Exhibit 7", ¶ 16).

RESPONSE:  Denied for the reasons stated in the response to para. 1-74. Retaliation and race were the motives. Ex. A, Woodruff.

76. Mayor Perrin set a meeting with the Plaintiff for January 25, 2017, as Plaintiff had appealed to the Mayor from the termination decision made by Ms. Allen. After the meeting he reviewed the PIP, emails between Ms. Allen, Cliff, Mr. Douglas, and the Plaintiff, including progress reports, notes, and things that hadn't been done. ("Exhibit 2", p. 36, lines 21-25, p. 38, lines 9-15; "Exhibit 6", 000056).

RESPONSE:  Admit he appealed, but it was a foregone conclusion for the reasons stated in the response to para. 1-75.

77. The Mayor ultimately affirmed Ms. Allen's decision on January 27, 2017. "Exhibit 6", p. 000057).

RESPONSE:  Admitted.

78. The Plaintiff ultimately appealed to the City Council on February 16, 2017, where he presented his facts and evidence. ("Exhibit 1", p. 105, lines 16-20, "Exhibit 9", Plaintiff's 2017 Appeal PowerPoint; "Exhibit 6", p. 000082.

RESPONSE:  Admit he appealed, was not represented, and did not have a chance to do discovery as in this case.  Ex. A, Woodruff.

79. Ms. Allen and Mayor Perrin's decisions were ultimately affirmed by the City Council on a vote of 11-1 in favor of upholding Plaintiff's termination. ("Exhibit 6", p. 000082).

RESPONSE:  Admitted.

WHEREFORE, Plaintiff prays that the Motion for Summary Judgment is denied, and for all other appropriate relief.

Respectfully submitted,

SUTTER & GILLHAM, P.L.L.C.
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile
Attorney for the Plaintiff

By:     */s/ Lucien Ramseur Gillham*
        Lucien Ramseur Gillham, ARBN 99199
        lucien.gillham@gmail.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the foregoing has been served on this 19th day of June, 2018, upon counsel for the Defendants as follows:

C. Burt Newell
C. Burt Newell, Attorney at Law
P.O. Box 1620
Hot Springs, AR 71902-1620
501-321-2222
Fax: 501-624-0533
Email: burtnewell@mac.com

Carolyn B. Witherspoon
Cross, Gunter, Witherspoon & Galchus, P.C.
P. O Box 3178
Little Rock, AR 72203-3178
501-371-9999
Fax:  501-371-0035
Email: cspoon@cgwg.com


By:      */s/ Lucien Gillham*_____
         Lucien Gillham, ABN 99199