# AFFIDAVIT OF ERICK WOODRUFF

My name is Erick Woodruff. I am over the age of 18, competent to tell the truth, and make these statements based upon personal knowledge.

RESPONSE TO PARA 1:  Admitted.

RESPONSE TO PARA 2:     I believe I was fired based on my reports and protected acts under the Whistleblower law and my race.  Admitted to the extent consistent with this, denied to the extent contradictory.

RESPONSE TO PARA 3:     Admitted.

RESPONSE TO PARA 4:     Admitted.  However, none of these people participated in the decision to fire me because none of them were still with the City.

RESPONSE TO PARA 4:   This is the second paragraph 4.  Admit that Perrin took office in 2009.  Admit that I became IT Department Head.  I deny this was a hire.  I was already working there at the time.  I was the Director of Public Works, reporting directly to then Mayor Doug Forman.  Mayor Forman had wanted to give me a raise and brought the issue to the Finance Committee of the City Council.  At the time, the following departments reported directly to me: sanitation, streets, code enforcement, engineering, planning, and inspections. Perrin at the time was on the City Council, and on that Committee.  Forman was not running again, and Perrin was running for Mayor. Perrin said that he wanted to wait to address the issue of the Director of Public Works' pay until after the election. So the issue was tabled. When Perrin became Mayor, he made me IT Department Head.  He said he wanted to have all department heads report directly to him, which I then did.  The effect of this was that I did not get the raise Mayor Forman wanted to give me, and my responsibilities were reduced. It was effectively a demotion.

RESPONSE TO PARA 6: Admitted.

RESPONSE TO PARA 7: Admitted.  He also should have been terminated for doing so. There had been prior discussions with the Mayor about things missing from Mark's computer.  Doing what he did violated City of Jonesboro computer use policies.  It was in the police department, so breaching their firewall would have put confidential information in jeopardy. If there were files or emails containing the identity of confidential informants or undercover officers, they would be in jeopardy.  Social Security Numbers, dates of birth, financial information, medical information, or addresses of employees could get disclosed.

RESPONSE TO PARA 9 and 10:     I note that paragraph 8 was skipped by Defendant. Denied. If you look at page 31 of my deposition (Def.'s Ex. 1) I testified that I tried to call the people in CID, and got Sgt. Cassie Brandon.  She checked and found the computer had been unplugged from the network. She plugged it back in. I then called the Chief of Police, then Barylske, and then Waterworth and could not get any of them.  I then drove and physically confiscated the computer. The Mayor could not have approved me taking the computer because I did not speak to him, or to anyone that would have communicated such a request.  Later, I did get in contact with Barylske, but it was after the computer was taken.  He agreed with what I had done, but he and the Mayor did not give me permission because it already occurred.  I think he was just a little mixed up on the order of things.

RESPONSE TO PARA 11:    I admit drove there and took the computer.  I admit I did this after attempting to reach the Chief, Barylske and Waterworth, and being unable to reach them.

RESPONSE TO PARA 12:    Admitted.

RESPONSE TO PARA 13:    I cannot admit or deny this, but it seems to me that the Mayor is the Chief Executive of the city, and can require any employee, including his son, to tell him what was going on in a situation like this. If they refuse to do so, he can fire them. According to the Mayor, he did not, and he continued to let his son work at the city, with access to police information, having attempted to breach their firewalls.  At the same time, the Mayor is claiming that he began this audit because of a concern for security.  That is inconsistent with letting his son continue to work and have access to these areas.

RESPONSE TO PARA 14:   Denied.  Because there was a help request around December 4th, I attempted to browse across the network to Mar's machine, and could not find it.  Me and Brandon Massey looked for it, and found it as "CID spare".  We remoted into the computer and saw Mark trying to change the firewall proxy settings.  Then the computer went dead, which possibly means it was disconnected.  We tried to reestablish connection and cannot make it. I then called everyone in CID and got Cassie Brandon, who found the computer unplugged from the network.  She plugged it in.  Mark was not there.  I attempted to contact the Chief, Barylske, and the Mayor and could not.  So I went and confiscated the computer.  After taking it, I talked to Detective Simpkins on the phone, and he told me that before I had been there, Mark had left, come back, plugged in a flash drive, and that the screen started blinking and flashing and doing weird things.  After talking with Simpkins, Massey and I found that the computer had been wiped.  Which is not easy to do. It had been in working order up to the moment Mark unplugged it. It appears that Mark was ready to wipe the computer at a moment's notice, which indicates

that he was hiding something. This is also destruction of property, which violates Jonesboro policy. The Chief denied to the Jonesboro Sun that the computer had been sent to the state police. Either he never sent it, and did not tell me the truth about doing so, or he did not tell the truth to the newspaper. The Chief reports directly to the Mayor. Either nothing was found by the state police because they never saw it, or because the computer was wiped by Mark, and they could not find anything.

RESPONSE TO PARA 15: Denied to the extent that I was not at that meeting. Admit the others named were in that meeting in December 2014, shortly after the problem with Mark. I would note that this was well before the contract was awarded in March of 2015, that the Mayor was familiar with Rushing from before then, and contacted him about this before then. Allowing a contractor inside information into what it is that you want and to dictate what it is you want certainly gives them an advantage when they are putting together their bid, as opposed to other contractors without that information. The Mayor also wrote notes on a document submitted to Rushing that were critical of me, and accused me of spying, of the city employees fearing I was spying on them, and things like that, which accusations were made shortly after the problems with Mark.

RESPONSE TO PARA 16: I deny this. First, if he was that interested in getting an audit done, it's strange that it took 5 years, until just after I found that his son had attacked the police department firewall, and then destroyed city property and evidence of his conduct. Those actions certainly violated city policy and may have been criminal. Second, if he was interested in an IT audit, and needed help getting a proposal done, it seems like he would talk to the IT Director (me), and he never did. Third, if he was interested in an analysis of what the IT Department, he could have talked to me about looking at the department for purposes of comprehensive improvement, and he never did. Fourth, if he was that concerned about security, why did he continue to let Mark have access? The circumstantial evidence indicates to me this is not true.

RESPONSE TO PARA 17: I deny it was important to him until he was looking for a way to get at me for the issues with his son, because it either took 5 years after he entered office, or 1 month after he saw me report his son's conduct. You can tell what is important by a person's actions. It was only important after my report, and not because the Mayor wanted an audit. In addition, we did have audits by the legislative audit, which we passed. We had audits by the FBI and CIJIS (Criminal Justice Information Services, which was passed. ACIC also audited us and we passed. The circumstantial evidence indicates to me this is not true.

RESPONSE TO PARA 18: Denied for the reasons stated in the response to paragraph 16 and 17.

RESPONSE TO PARA 19:   Denied for the reasons stated in the response to paragraph 16 and 17.

RESPONSE TO PARA 20:   Denied for the reasons stated in the response to paragraphs 16 and 17.

RESPONSE TO PARA 21:   I admit they met with Edgewater in December 2014, shortly after my reports of Mark Perrin's conduct.  I admit that they are required to send out Requests for Proposal.  I believe that Edgewater had a competitive advantage on submitting a proposal, and was essentially pre-selected to win that bid, by virtue of the Mayor meeting with them, asking them exactly what to ask for, and telling them exactly what he wanted.

RESPONSE TO PARA 22:   I admit this is a general outline of how RPFs work, though it's not complete.  I believe the Mayor's desire was to get rid of me and get the contractor of his choice, regardless of the RFP process for the reasons stated in the responses to paragraphs 16-17, and 21.

RESPONSE TO PARA 23-24:  Denied in part, admitted in part.  Admit that Edgewater's bid was accepted in 2015. Deny all else the attempt to act as though the Mayor had nothing to do with that choice and that it was the choice of the finance committee, for the reasons stated in the response to paragraphs 16, 17, and 21.  If the scoring was that close it seems likely the Mayor's prior contacts with Edgewater would give them an edge.  Furthermore, the Mayor testified at pages 29-30 of the deposition that he was involved, along with his subordinates, Barylske,  L.M. Duncan (Operations director), and Mr. Geisler (Director of Communications), who all owed their jobs to the Mayor. Also, Laurie Johnson of Edgewater, wrote an email in January 2, 2015, that stated exactly what it was that Edgewater was going to be doing, well before the grading or award or RFP.  It was at the Mayor's request and if you read, it is very clear, they are not suggesting what kind of proposal the City should make, they confirming with the Mayor what they are going to do when they get that proposal. Also, it is strange to be grading an IT proposal when you don't ask the IT director for his input.  I had more knowledge about IT than any of the graders.  In addition, there is handwritten direction from the Mayor telling Edgewater exactly what he wants to do, which included personal, direct attacks on me.  Prior to this, I had gotten a good performance evaluation, I had no discipline, and I got the Mayor's award which was the equivalent of employee of the year.

RESPONSE TO PARA 25: Admitted.

RESPONSE TO PARA 28:  I admit they did these things, and I admit that Barylske who was CFO, stated the audit was unfair and unprofessional, which is significant given that Barylske was with the Division of Legislative Audit for around 10 years.   See his

deposition testimony at pages 41-43.  I admit the Mayor told Edgewater what he wanted very clearly when he directed them to look at me using personal attacks on me.

RESPONSE TO PARA 29:   Denied.  First, how would he know this – he didn't do it.  Second, the whole statement is ridiculous for a number of reasons:
1. To access the network, and the computers in the network, you must have a user id and password established by my department. The auditors never got either. They had to look over the shoulder of my techs and myself to review the network. They could not have made any changes.
2. The firewall worked pretty well when it caught and stopped Mark Perrin's attempts to put things on the computer he should not.
3. Firewalls have logs which describe the number of attacks made on them daily.  Attempted attacks happened on a daily basis through the internet.  If the network was "wide open" due to the firewall, there would have been numerous successful attacks.
4. The comments about it not being "wired correctly" is out of nowhere.  The computers are wired into the network by ethernet cables. They do not access the internet directly, but go through a proxy server.  The proxy server is what connects to the internet.  It is controlled by the IT department, and is where the information about what various users (city employees) can do.  So for instance, if they type in the name of a pornography site, they will not be allowed to go to it.  Wiring would not have been a problem with the firewall.  The kinds of problems you would have with a firewall is that it is not updated to catch new kinds of threats. This was  new firewall, and it was up to date.

RESPONSE TO PARA 30:    Admitted in part, denied in part.  First, IT is a constantly changing discipline.  It's fair to say that people working in this discipline would always be benefitted by more training.  Second, the Network Administrator had been there for more than 10 years.  He had received training and certifications The network tech had been there 8-9 years and had received training and certifications. Third, the city does not pay what private industry does.  This makes it difficult to retain and recruit IT people.  Fourth, we were understaffed and underfunded, which Rushing also found to be the case.  When I submitted plans for training and additional staff, to reduce our workload, it was denied.  This increases workload, which affects the time we have to train, and what training we can pay to do.

RESPONSE TO PARA 31:    Denied.  First, there is a difference between browsing into a computer and remoting into a computer.  If you browse to a computer, you get on the root of the computer itself, and look at things on the actual computer.  The user would have no way of ever knowing that you had done it.  Even if they were on the computer, at the same time, using it, there is simply no way they would notice. Remoting into a computer is different.  You can request permission to enter that computer, or do a forced remote.  If the user is not there, you can take it over.  Then they could tell someone was remoted into

the computer because the mouse pointer would actually move, and they could see windows being opened. It was easier and simpler to browse into the computer for me and the people under me. We would have no reason to remote into the computer. Second, if we wanted to look at emails, we can access them directly through the mail server, without having to go to an employee's computer. It would be easier to go through the mail server. Third, if these things were happening, there should be logs on the server and computers to establish this. Surely an auditor such as Rushing could do that. Fourth, we were way to busy to be poring over emails. It would be boring and a waste of time. Fifth, the Mayor told Edgewater what to find on this point in his handwritten notes. Who else did he give instruction to on this issue – what employees? Sixth, this is Rushing's account of what he was told by other people. It would be interesting to hear what they actually were asked and what they actually said. Seventh, this is part of what Barylske identified as being unfair and unprofessional in his deposition at pages 41-43.

RESPONSE TO PARA 32:    Denied. We did have policies and procedures for the help-desk, maintaining the network, backing up the network, and securing the network.

RESPONSE TO PARA 33:    I admit the biased, predetermined, retaliatory and discriminatory findings were submitted to City Council on 9/15/15.

RESPONSE TO PARA 34:    Everyone knows that consultants frequently come up with findings that strongly suggest they should be hired to implement their findings. They did about 2 days of work at the facility total, and got paid nearly $50,000 to do it. Of course they found something.

RESPONSE TO PARA 35:    Admitted.

RESPONSE TO PARA 37:    Admitted.

RESPONSE TO PARA 38:    Admitted in part, denied in part. Admit Allen worked with Rushing to draft a PIP for me. Deny it was objective. Deny they were trying to ensure that audit recommendations were timely and properly implemented. First, they said we were short-staffed and needed training. When I presented a budget with additional staff and training. This was denied. It seems unfair to find that my staff is undertrained, and there are not enough of them, and then complain about the amount of work we are getting done. Second, they are claiming we did not have policies, as described in paragraph 32. That was not true. Third, they complained about Airwatch not being fully implemented, but that has never been fully implemented to this day. Furthermore, part of why it did not get implemented is than app was part Airwatch, and it was removed from the Appstore due to problems. That is not my fault. Fourth, they complained about certain programs not having been updated. One of those was a program written by an individual, to which there are no updates, and it just needed to be scrapped. The other was a program that had

updates available, but they were not necessary, provided no service we needed, and cost money, so after discussion with CFO Barylske, we decided not to update it.  Fifth, my replacement, a Caucasian who did not engage in whistleblowing, thinks I was a good boss, and still calls me with questions about how to do the job, which I respond to, to give the city help. Sixth, the PIP was based on the findings of Edgewater, which arose out of an investigation aimed at me, that was described as unprofessional and unfair. Seventh, during the period of this PIP, we had an entire 911 Center to rewire, which we did successfully, without it ever going down.  Previously, that sort of work had gotten me the Mayor's Certificate. Eighth, the PIP was a lot of busy work, that added to my workload, without actually causing much to be accomplished. According to them my staff and I were understaffed and undertrained (which they refused to fix), we had a major project in the 911 Center, and I had the additional PIP busywork.  All they did was make my job harder with additional detailed explanations in regards to all responses made to Suzanne Allen, CFO. Example – I was required to look up detailed purchases as well as renewals on every request by Suzanne Allen. These requests sometimes took days to gather the information required to make a response to Suzanne Allen.

RESPONSE TO PARA 39:  Denied as to Allen's and Rushing's interests for the reasons stated in the response to para. 38.  As to second sentence, deny.  Rushing, Perrin, Allen, Witherspoon, and Douglas, all drafted the PIP together.

RESPONSE TO PARA 40:    Admitted in part, denied in part.  Admit that the audit found things.  But if you go to an IT Department as an auditor, you're always going to find something. Deny all findings were accurate – for example the supposed lack of policies discussed above.  Deny they were actually interested in fixing the problems. They said I did not have enough staff and they needed training, and I got neither.  Then they try to blame me for not getting things done, when they have also added to my workload.  See the issues described in response to para. 38 above.

RESPONSE TO PARA 43:    Denied.  As stated above, the Mayor instituted this right after the report on Perrin, told Edgewater what he wanted to find, made sure Edgewater got the job, made sure they knew to target me through their notes, they carried out an investigation that was unfair and unprofessional according to Barylske, under resourced me to hamper me carrying out the changes Edgewater wanted, Edgewater's findings were partially false (spying, no policies and procedures, not updating a one-off program or doing unneeded and costly updates), blamed me for things not within my control (Airwatch), and people like Allen and Douglas report to the Mayor. The circumstantial evidence shows every part of this was unfair and targeted at me, and I believe that he continued to make his desires known to Rushing,  Allen, and Douglas.

RESPONSE TO PARA 44:    Admitted.

RESPONSE TO PARA 45:  Admitted, but I cannot verify.

RESPONSE TO PARA 46:   Denied. The notes state that they wanted to change the support policy because it stated maximum response times, but did not say response could be earlier.  Of course a response can be earlier.  Nothing says it cannot.  Changing that language is meaningless. As to the budget, the budget I put together is the normal format for a budget put together in Jonesboro.

RESPONSE TO PARA 47:   As to COJ 168-169 (D.E. 25-9, p. 70-71), the email chain reflects that they asked about whether or not requirements were provided to the vendor for a business continuity document on May 4.  That was done before I was IT Director, and so would have been more than 7 years old.  I had asked purchasing for it (if it still existed), but the employee was out and could not respond yet. I told them this by May 6.  COJ 279 shows the infrastructure team had the plan by May 2 to review.  As to the project budget, they told me I had to have a reason, and I gave them one – increasing bandwidth.  Then they said that was not enough, I needed to say why more bandwidth was desired.  This is the sort of thing that is capable of infinite reduction, if you are looking to create a problem where none exists.  Side by side changes for Microsoft Office 2007 vs. 2016 was the guide from the Microsoft Migration team recommendation.

RESPONSE TO PARA 48:    Denied.  I was not submitting anything for approval – they asked to see the Business Continuity Plan, one already existed, and I sent it to them.  As to Springbrook, I responded to her email in less than an hour.  Furthermore, there was a response given. Allen then asked for full descriptions of versions, options, migration of legacy software.  These responses were researched with two vendors which required more than one or two days to compile accurate, detailed information as requested by Allen.  All this was taking place while trying to work PIP, FOIA items and other City of Jonesboro projects that are listed in the project weekly update report as well.

RESPONSE TO PARA 49:  The audit stated that we were understaffed and that the user to IT ratio was way too high.  I created a budget using standard City of Jonesboro budgets.  Cliff told me it was good.  Now they claim it is bad.  Furthermore, their job titles explain what they would be doing: "administrative assistant" and "help desk people".  In addition, I was told to create a budget, which I did. I created the same budget, and budget request as all other COJ department heads.  The request for budget was submitted November 3, 2015 to Suzanne Allen with the incorporation of Edgewater's "Next Steps" to mitigate their audit finds.  The budget created did show salary increases for current staff which is common practice within COJ departmentalized budgets.  It is also common practice that any job descriptions, especially newly created positions, come from the Director of Human Resources.  All job descriptions with appropriate pay scales comes directly from HR.

RESPONSE TO PARA 50:    Denied.  First, Airwatch deployment has never yet been completed, and if they say it has, they are lying.  Second, I was not untruthful. Third, part of the reason for the Airwatch delay was that their app was taken out of the Appstore.

Fourth, part of the reason things did not get done quicker is that my office was understaffed, and according to them, undertrained, and my requests for more staff and training were not approved.  Fifth, I would note we were also rewiring an entire 911 Center in that same year, which occurred without the Center ever going down.  Sixth, on May 9, I requested that a new FTP server be purchased to deploy Airwatch, which was not approved until May 25, and that on June 7 the Airwatch App was removed from the Appstore, that on June 17 the servers actually arrived in Jonesboro, that on June 23 Airwatch went back on the Appstore and we would resume testing. Also, the Airwatch deployment project was assigned to current Director of Information Systems, Jason Ratliff.   This timeline was not something I made up in a vacuum.  It was discussed with her. She knew what was going on. (See email dated July 6, 2016, 3:41 P.M – Subject: Airwatch: TO: Suzanne Allen.  Also,  on March 7 all projects were put on hold by Suzanne Allen after issuing me the bogus PIP.

RESPONSE TO PARA 51:  As it relates to the bogus PIP, emails between Rushing, Allen, and Douglas, COJ 000198 shows clearly Rushing provided written detailed examples, explanations, and recommendations but were vague with me. Never provided this type of detailed emails to me.  I was excluded from covert emails regarding my PIP progress.

RESPONSE TO PARA 52:    See email dated August 5, 2016 sent 3:07 P.M. to Cliff Rushing and copied to Suzanne Allen and Dewayne Douglas. The subject is: ITEMS. Three attachments for Networks Security policy, VLAN SOW, and IT operations and maintenance Plan were provided at this time.  Also, see email August 5, 2016, sent at 4:00 P.M. to Suzanne Allen, copied to Dewayne Douglas – the subject is ITEMS.  The email body explains why I had not submitted the items requested due to a FOIA that required me working on Saturday as well as Sunday to fulfill the FOIA request relating to Wixson Huffstetler's racial tweet. Provided Suzanne Allen with updates as to timeline for FOIA completion and the extreme number of emails that had to be vetted, redacted between COJ attorneys and myself.  See email dated July 27, 2016 to Cliff Rushing, copied to Suzanne Allen and Dewayne Douglas at 5:09 P.M  and 6:08 P.M - subject is ITEMS – COJ 000175 explaining there were 1100 emails regarding the FOIA request.

RESPONSE TO PARA 53:    What proof warrants an exchange requesting an email response at 9:59:04 P.M?  Requesting vacation is a right and is was done on the required written request for vacation time.

RESPONSE TO PARA 54:    August 5, 2016,  I submitted network security policy, VLAN SOW and O&M plans.  They were in PDF format.  After Rushing requested the documents on August 12, 2016, be in Office format with track changes on, they were then submitted back to Rushing on August 12 in Office format WITH track changes. August 12 was the FIRST time Rushing had requested Office format with track changes. Attachments included: IT Operations & Maintenance Plan, Networks Security Policy, Staffing Plan, and VLAN SOW.  Also, COJ Disaster Recovery Plan RFQ (Request for

Qualifications), Throughput Test Results (from Ritter), COJIS Technical Support Document were submitted in PDF format. The COJIS Technical Support document was a completely new document which had been totally revised, therefore all changes that had been made prior to Rushing's request were already edited. COJ Requirements for Disaster Recovery and Throughput Test Results were not part of my work product. These items were from a vendor (Ritter) and COJ Purchasing Agent for the RFQ. These items were not a part of my bogus PIP requirements. There were two new documents submitted in Excel format – Meeting agenda and Project Roadmap.

RESPONSE TO PARA 55: Deny that I told half truths. I was doing what I was asked to do, though the circumstances were that I was doing it in a circumstance designed to cause me to fail. I say this for several reason: (1) they knew I was understaffed and according to them undertrained, but they did not let me get additional staff; (2) they now claim I didn't make the request for staff in the appropriate way, but I made it in the budget, in Jonesboro's standard format, and Cliff told me it was good; (3) I was given a PIP that contained false information – like we did not have policies; (4) I am being accused of not doings when I had done them; (5) the PIP was vague and when I sent something to Cliff he would just attack it, and then send details about what he wanted to Suzanne secretly. As far as things not being in progress when I said they were, if I said they were in progress then they were. Any statement otherwise is not correct.

RESPONSE TO PARA 56: Denied – if you look at that testimony, it does not even talk about Cliff.

RESPONSE TO PARA 57: Admit I was given a Final Written Warning on that date. Deny that it was valid. It was part of the retaliation set up by the Mayor, for the reasons stated in paragraphs 1-56.

RESPONSE TO PARA 58: Admit I was denied a salary increase. Deny it was due to the final warning. It was part of the retaliation described in paragraphs 1-57.

RESPONSE TO PARA 59-60: Denied for the reasons stated in the response to para. 43. In addition, no one else was denied a raise, even though some of them had discipline in their file, for example, Wixson Huffstetler, Director of Parks & Recreation, and also a Caucasian male. He was white and engaged in no whistleblowing activities.

RESPONSE TO PARA 60: Denied for the reasons stated in response to paragraphs 1-59 above.

RESPONSE TO PARA 65:  On October 20, 2016, I terminated the T-1 circuit that saved the City of Jonesboro $2,821 per month and $33,852 annually and stated the reason why to Suzanne Allen, Mayor Perrin, Jeff Presley (E911 Director), Teresa Shaver, (Accounts Payable) and Ed Tanner (Chief Operations Officer).  This circuit was not in use and was not my responsibility.  It had been budgeted in the E911 departmental budget since 2008.  On September 30, 2016, I added the AT&T circuit (line item 18) on my WEEKLY project task list email to Suzanne Allen.  On October 20 I sent the formal email detailing the termination of the AT&T T-1 line in question. There were 6 (six) updates provided that included this information to Suzanne Allen on a weekly basis. We discussed in person multiple times how I would provide updates on projects I was working on.  All this information was provided to Allen on November 14 as well as dates prior to November 14.  See email from Woodruff to Allen on November 14, 2016 – 4:32 P.M. with attached project task list – RE: AT& T Land Line Charges.

RESPONSE TO PARA 66:  Denied for the reasons stated in response to paragraph 1-65, particularly 43.

RESPONSE TO PARA 70:  I don't keep track of what they do to various African-American employees in the City.

RESPONSE TO PARA 71:  Denied. Even Defendant has admitted that I requested an administrative assistant and three additional help desk employees.  See D.E. 26, SUF 49, Ex. 4, p. 20, lines 7-20

RESPONSE TO PARA 72:  Admitted – and they recommended that we get additional employees because we were severely understaffed, and said we needed training, and they denied additional staff and training, and then complained about the amount of work I could complete.

RESPONSE TO PARA 73:  Denied.

RESPONSE TO PARA 74:  Admit there was an audit. Once again, if an audit is done of an IT department, improvements are always possible. If I had had adequate staff, and got the training we requested, that certainly would have helped. I had been asked by the municipal league to come and give presentation on IT and policies and procedures, but was unable to do so.

RESPONSE TO PARA 75:   Denied. It was retaliation and race discrimination for the reasons stated in response to para. 1-74.

RESPONSE TO PARA 76:   Admit Plaintiff appealed. Deny this was valid. It was retaliation for the reasons stated in para. 1-75.

RESPONSE TO PARA 77:   Admitted.

RESPONSE TO PARA 78:   Admit I appealed, was not represented, and did not have a chance to do discovery as in this case.

RESPONSE TO PARA 79:   Admit.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct (a sworn statement pursuant to 28 U.S.C. 1746)

_____
Name

_____
Date